UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BAYVIEW PLAZA TENANTS ASSOCIATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GENE BOUMA, et al.,<br><br>Defendants. | CASE NO. C17-1771JLR<br><br>ORDER ON FEDERAL DEFENDANTS' MOTION TO DISMISS |

## I.  INTRODUCTION

Before the court is Defendants Sonny Perdue, Secretary of the United States Department of Agriculture ("USDA"); D.J. LaVoy, Deputy Undersecretary for Rural Development, USDA; Bruce W. Lammers, Administrator of the Rural Housing Service, USDA; and Kirk Pearson, USDA Rural Development State Director for Washington

//

//

State's (collectively, "Federal Defendants")[1] Federal Rule of Civil Procedure 12(b)(1) motion to dismiss the Amended Complaint for lack of subject matter jurisdiction. (*See* MTD (Dkt. # 93); *see also* FAC (Dkt. # 53).)

On August 6, 2019, the court granted a stipulated motion between Plaintiffs Bayview Tenants Association, Washington Plaza Tenants Association, Paul E. Werth, and Does 1-3, and 5 (collectively, "Plaintiffs") and Defendants Gene Bouma, Washington Plaza Limited Partnership, Bayview Plaza Limited Partnership, and Diamond Management, Inc. (collectively, "Owner Defendants") to dismiss with prejudice Plaintiffs' claims against Owner Defendants. (8/6/19 Order (Dkt. # 86).) Thus, the only claims remaining are Plaintiffs' claims against Federal Defendants. (*See* FAC ¶¶ 63-120.)

In their response to Federal Defendants' motion, Plaintiffs admit that "claims 1 through 4 and 7 through 9" of their amended complaint "have become moot and should be dismissed." (Resp. (Dkt. # 96) at 1.) Accordingly, the court DISMISSES these claims WITH PREJUDICE. (*See, e.g.*, FAC ¶¶ 63-97, 110-20.) Nevertheless, Plaintiffs oppose Federal Defendants' motion to dismiss their fifth and sixth claims as moot. (*See* Resp. at

//
//
//
//

---

[1] Undersecretary LaVoy and Administrator Lammers are automatically substituted as Defendants in place of Roger Glendenning and Joel Baxley, respectively. *See* Fed. R. Civ. P. 25(d). The court DIRECTS the Clerk to make this substitution on the court's docket.

1; *see also* FAC ¶¶ 98-109.) Thus, the court addresses only those portions of Federal Defendants' motion that concern these two remaining claims.[2]

The court has reviewed Federal Defendants' motion, the parties' submissions filed in support of and in opposition to the motion, the relevant portions of the record, and the applicable law. Being fully advised,[3] the court GRANTS Federal Defendants' motion and DISMISSES Plaintiffs' remaining claims WITH PREJUDICE.

## II. BACKGROUND

**A. Statutory and Regulatory Background**

This lawsuit involves a federally subsidized rental housing program for lower-income tenants know as the Section 515 program. (*See* FAC ¶¶ 20-32.) The program derives its name from Section 515 of the Housing Act of 1949, 42 U.S.C. § 1485. Federal Defendants administer the Section 515 program. (*See* FAC ¶¶ 10-13.)

Under the Section 515 program, Federal Defendants make and/or insure subsidized, low-interest loans to developers, like Owner Defendants, who agree to build and operate rental housing for lower-income tenants. *See* 42 U.S.C. § 1490a(a)(2)(A); (*see also* FAC ¶¶ 14-19, 21, 34, 38). In exchange for reduced interest rates and other

//

---

[2] Plaintiffs' ninth and tenth claims apply only to Owner Defendants and, as noted above, the court dismissed these claims on August 6, 2019. (*See generally* 8/6/19 Order; *see also* FAC ¶¶ 121-28.)

[3] Plaintiffs request oral argument on Federal Defendants' motion. (*See* Resp. at 1.) Because the parties have thoroughly briefed the issues, the court does not consider oral argument to be helpful to its disposition of Federal Defendants' motion. *See* Local Rules W.D. Wash. LCR 7(b)(4) ("Unless otherwise ordered by the court, all motions will be decided by the court without oral argument."). Accordingly, the court DENIES Plaintiffs' request for oral argument.

subsidies, borrowers agree to rent exclusively to qualified low-income tenants. *See* 42 U.S.C. §§ 1490a(a)(2)(A), 1490a(a)(3)(A)-(B).

Property owners often use the Section 515 program in conjunction with Federal Defendants' Section 521 Rental Assistance program, which provides project-based rental assistance payments to property owners to subsidize tenants' rents to an affordable level. (*See* MTD at 4.) Tenants in units subsidized by the Section 521 Rental Assistance program pay 30 percent of their income toward rent. *See* 42 U.S.C. § 1490a(a)(2)(A). Federal Defendants' Section 521 Rental Assistance program payments to Section 515 property owners make up the difference between the total rent and the rent tenants pay under the Section 521 Rental Assistance program. *See id*.

Section 515 loans typically have long-term repayment periods that span decades. *See* 42 U.S.C. § 1485(a)(2). During the repayment period of a Section 515 loan, the property is subject to federal regulations that govern operation of the property, including rent levels. *See generally* 7 C.F.R. Part 3560. An owner may prepay a Section 515 loan issued prior to 1989—such as the loans at issue here—and remove it from the program. *See* 42 U.S.C. § 1472(c)(5)(G)(ii). However, if Federal Defendants determine that removing a property from the Section 515 program would materially affect "housing opportunities of minorities" or that there is an insufficient "supply of safe, decent, and affordable rental housing" in the market area to accommodate each tenant who would be displaced by prepayment, Federal Defendants will attach certain conditions to prepayment. *See id*. If Federal Defendants determine that there is an inadequate supply of affordable housing in the community, but that prepayment will not materially affect

the housing opportunities for minorities, Federal Defendants require the prepaying owner to enter a Restrictive Use Covenant to protect the goals of the Section 515 program. *See* 42 U.S.C. § 1472(c)(5)(G)(i); 7 C.F.R. § 3560.662.

Federal Defendants also administer a voucher program to subsidize the rents of low-income tenants in Section 515 projects after an owner prepays a Section 515 loan. *See* Rural Development Voucher Program, 82 Fed. Reg. 21,972 (May 11, 2017). At the time an owner prepays a Section 515 loan, Federal Defendants determine the market rate rent for the apartment at issue. *See id.* at 21,973, ¶ II.b. The voucher generally equals the difference between the market rate and the amount of the tenant's contribution, which is generally 30 percent of their income. *See id.* at 21,974, ¶ II.e; *see also* 42 U.S.C. § 1490a(a)(2)(A). The tenant may use the voucher at his or her current apartment or at another rental unit that meets Federal Defendants' requirements and whose owner agrees to accept the voucher. *See* 82 Fed. Reg. at 21,974 (para. II, f). Because the voucher provides funding over 12 monthly payments, the tenant must sign a new 12-month lease when the tenant begins receiving the voucher. *See id.* at 21,973 (para. II, c), 21,974 (para. II, g).

**B. Factual Background**

Bayview Plaza and Washington Plaza are two Section 515 projects located in Blaine, Washington and Ferndale, Washington, respectively. (FAC ¶¶ 14-15.) Both Bayview Plaza and Washington Plaza were built and financed in the early 1990s with Section 515 program loans. (FAC ¶¶ 34, 38.) The loans had fifty-year repayment terms

//

that were set to conclude in 2032. (Administrative Record ("AR") (Dkt. # 95-2) at 23, 37 (Deeds of Trust).)

Owner Defendants prepaid the balances on both Section 515 program loans in November 2017. (FAC ¶ 60.) Before approving Owner Defendants' prepayment applications, Federal Defendants determined, as required by law, that removing Bayview Plaza and Washington Plaza from the Section 515 program would not materially affect the "housing opportunities of minorities." (*See id.* ¶¶ 46-47); *see also* 42 U.S.C. § 1472(c)(5)(G)(ii). However, Federal Defendants also determined that there was not a sufficient "supply of safe, decent, and affordable rental housing" in the Blaine and Ferndale market area to accommodate each tenant at the two properties if those tenants were displaced by the prepayment. (*See* FAC ¶ 48.) Accordingly, Federal Defendants required Owner Defendants to sign and record Restrictive Use Covenants for both Bayview Plaza and Washington Plaza before accepting their prepayments of the Section 515 program loans. (*See id.* ¶¶ 49-50, 61; *see also* Owen Decl. (Dkt. # 6) ¶¶ 5-6, Exs. 3-4.) The Restrictive Use Covenants required Owner Defendants to continue to use the two properties in compliance with Section 515 and applicable regulations, *see* 7 C.F.R. Part 3560; *see also* 42 U.S.C. § 1485, among other requirements. (*See* Owen Decl. ¶¶ 5-6, Exs. 3-4.)

In the week before they prepaid both Section 515 loans, Owner Defendants contacted the tenants in Bayview Plaza and Washington Plaza and instructed them to sign new leases that would be effective November 1, 2017. (FAC ¶ 57.) In response to tenant complaints, Federal Defendants intervened to prevent Owner Defendants from imposing

new leases before Federal Defendants accepted prepayment of the Section 515 program loans. (*See id.* ¶ 59.) Specifically, Federal Defendants informed Owner Defendants that the new leases they were imposing on tenants in Bayview Plaza and Washington Plaza could not be effective until December 1, 2017. (*Id.*) However, Federal Defendants told the tenants that they would not otherwise intervene. (*Id.*)

In late November 2017, before the new leases took effect, Plaintiffs filed this action and stipulated with Owner Defendants to a temporary restraining order (TRO) that retained the previous leases, "including rent payments and all terms and conditions," and prohibited Owner Defendants from implementing the new leases. (*See* Compl. (Dkt. # 1); Stip. TRO (Dkt. # 27).) Through a series of further stipulations, the parties agreed to keep the restrictions of the stipulated TRO in place through resolution of Plaintiffs' claims against Owner Defendants. (*See, e.g.*, Notice (Dkt. # 35); Order Extending Stay (Dkt. # 79); *see also* 8/6/19 Order (dismissing Plaintiffs' claims against Owner Defendants).) Thus, the new leases proposed by Owner Defendants never took effect.

While the old leases remained in effect, maintaining the status quo, Plaintiffs, Owner Defendants, and Federal Defendants worked to resolve Plaintiffs' complaint by rescinding Owner Defendants' loan prepayments, bringing Bayview Plaza and Washington Plaza back into the Section 515 program, and recording new Restrictive Use Covenants against the properties that prohibit loan prepayment and ensure the statutory and regulatory protections of the Section 515 program through the maturity of mortgage loans in 2032. (*See* Stip. MTD Owner Defendants (Dkt. # 82); Traxler Decl. (Dkt. # 94) ¶ 2, Exs. A, B (attaching copies of Restrictive Use Covenants that were executed by

Owner Defendants as a condition of Bayview Plaza and Washington Plaza's re-entry into the Section 515 program).)

With Bayview Plaza and Washington Plaza back in the Section 515 program, and the new Restrictive Use Covenants in place, Plaintiffs and Owner Defendants jointly moved to dissolve the TRO in July 2019. (*See* Stip. Mot. to Dissolve TRO (Dkt. # 83).) The court granted the motion to dissolve the TRO, and Plaintiffs and Defendant Owners entered into new, mutually-agreed leases. (*See id.* at 2 (explaining need for the execution of new leases); 7/15/19 Order (Dkt. # 84).) Plaintiffs then voluntarily dismissed their claims against Owner Defendants with prejudice. (*See* Stip. MTD Owner Defendants; 8/6/19 Order.)

Federal Defendants were not parties to the settlement agreement executed between Plaintiffs and Owner Defendants. (*See* Stip. MTD Owner Defendants; 8/6/19 Order.) Plaintiffs have declined to dismiss their claims against Federal Defendants. (*See* MTD at 9; *see also* Dkt.) Federal Defendants now move to dismiss Plaintiffs' remaining claims against them as moot. (*See generally* MTD.) As noted above, Plaintiffs agree that the court should dismiss all of its claims against Federal Defendants except for its fifth and sixth claims. (*See* Resp. at 1.) Accordingly, the court dismisses with prejudice claims 1 through 4 and 7 through 9, and addresses only Federal Defendants' motion to dismiss as moot claims 5 and 6 below.

//

//

//

# III. ANALYSIS

## A. Standards

"Federal courts lack jurisdiction to consider moot claims." *Rosemere Neighborhood Ass'n v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1172 (9th Cir. 2009) (citing *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)). The mootness doctrine is rooted in Article III of the Constitution, which limits federal courts' subject matter jurisdiction to "cases" or "controversies." U.S. Const. art. III, § 2, cl. 1; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988) (citing *United States v. Geophysical Corp. of Alaska*, 732 F.2d 693, 698 (9th Cir. 1984)). "A case becomes moot whenever it los[es] its character as a present, live controversy of the kind that must exist if [courts] are to avoid advisory opinions on abstract propositions of law." *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 924 (9th Cir. 2000) (quoting *Hall v. Beals*, 396 U.S. 45, 48 (1969)); *see also Rosemere*, 581 F.3d at 1172-73 ("A claim is moot if it has lost its character as a present, live controversy.") (quoting *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F3d 1118, 1123 (9th Cir. 1997)).

Mootness is the doctrine under which courts ensure that "a live controversy [exists] at all stages of the litigation, not simply at the time plaintiff filed the complaint." *Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1253 (9th Cir. 2007). It is not enough to survive a mootness challenge for there to have been an actual dispute at the time the complaint was filed; there must remain a "live" controversy throughout all stages of the

court's review. *Burke v. Barnes*, 479 U.S. 361, 363 (1987); *Preiser v. Hewkirk*, 422 U.S. 395, 401 (1975). Essentially, any change in the facts that ends the controversy renders the case moot. *See Sosna v. Iowa*, 419 U.S. 393, 403 (1975). Even if a case is not constitutionally moot, the court may in its discretion dismiss a claim as prudentially moot "if circumstances have changed since the beginning of litigation that forestall any occasion for meaningful relief." *Deutsche Bank Nat. Tr. Co. v. FDIC*, 744 F.3d 1124, 1135 (9th Cir. 2004).

Nevertheless, courts recognize a "voluntary cessation" exception to mootness. *Rosemere*, 581 F.3d at 1173. "Under this doctrine, the mere cessation of illegal activity in response to pending litigation does not moot a case, unless the party alleging mootness can show that the 'allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citation omitted)). Without such an exception, courts would be compelled to leave a defendant "free to return to [its] old ways." *Id.* (quoting *Porter v. Bowen*, 496 F.3d 1009, 1017 (9th Cir. 2007) & *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199 (1968)).

When the court considers a Federal Rule of Civil Procedure 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the court may "hear evidence regarding jurisdiction" and "resolve factual disputes where necessary." *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009) (quotation marks, alterations, and citations omitted). "Once challenged, the party asserting subject matter jurisdiction has the burden of

//

proving its existence." *Id.* (quoting *Rattlesnake Coal. v. E.P.A.*, 509 F.3d 1095, 1102 n.1 (9th Cir. 2007)).

**B.     Claim 5**

Plaintiffs' fifth claim alleges that 7 C.F.R. § 3560.662(f) and the original Restricted Use Covenants recorded in November 2017 illegally authorize Federal Defendants to waive the Restrictive Use Covenant limitations if vouchers provided to tenants after loan prepayment terminate for reasons beyond the control of Owner Defendants. (*See* FAC ¶¶ 98-103.)  Section 3560.662 sets forth a series of "restrictions" with which all Restrictive Use Covenants "must be in accordance." *See* 7 C.F.R. § 3560.662.  Subsection 3560.662(f) requires that owners "will be released from these obligations before the termination period . . . only when the Agency determines that there is no longer a need for the housing or that financial assistance provided the residents of the housing will no longer be provided due to no fault, action or lack of action on the part of the borrower." *See* 7 C.F.R. § 3560.662(f).  Plaintiffs allege that there is no statutory authority for this subsection and that it violates the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA"), 42 U.S.C. § 1472(c).[4]  (*See* FAC ¶ 99; *see also* Resp. at 5.)

---

[4] Plaintiffs' claim is based on ELIHPA's prohibition on Federal Defendants accepting an owner's request to prepay a Section 515 loan without restrictions or preconditions, except when (1) an owner has offered to sell the development to a nonprofit or public agency and no good faith offer has been made to purchase the property, *see* 42 U.S.C. §§ 1472(c)(5)(A), 1472(c)(5)(G)(ii); (2) a good faith offer has been made to purchase the property but the sale has not been completed within 24 months, *see* 7 C.F.R. § 3560.559(k); or (3) Federal Defendants have determined that the prepayment will not have a material impact on minority housing opportunities and that there is adequate alternative, decent, and affordable housing in the

Federal Defendants argue that Plaintiffs' fifth claim is moot because Federal Defendants rescinded Owner Defendants' loan prepayments and those prepayments will not recur due to Plaintiffs' settlement with Owner Defendants and the new 2019 Restrictive Use Covenants, which ensure that both Bayview Plaza and Washington Plaza will remain subject to the Section 515 program and its regulations until 2032. (MTD at 18-20.) Specifically, Federal Defendants argue that because Federal Defendants rescinded prepayments for Bayview Plaza and Washington Plaza, Plaintiffs are not eligible for the Rural Development Voucher program that is addressed in the challenged regulation and the Restrictive Use Covenants. (Resp. at 19.) Moreover, Federal Defendants point out that Plaintiffs have never alleged that they are recipients of "[Housing & Urban Development ("HUD")] Section 8 vouchers," which is the only type of assistance addressed in the relevant provisions of the Restrictive Use Covenants.[5] (*Id.*) As residents of properties that are not prepaid and that remain in the Section 515 program, Plaintiffs do not receive vouchers. *See supra* § II.A. Thus, Defendants assert Plaintiffs' fifth claim is moot. (MTD at 18-19.) Further, Federal Defendants argue that because Owner Defendants can no longer prepay the loans, the voluntary cessation exception to mootness does not apply. (*See id.*; *see also* Reply at 1-2.)

---

community to which residents of the prepaid development can relocate as of the date of prepayment, 42 U.S.C § 1472(c)(5)(G)(ii). (*See* Resp. at 5.)

[5] HUD funds the Housing Choice Voucher ("HCV") program and "pays rental subsidies [to] eligible families [allowing them to] afford decent, safe and sanitary housing." 24 C.F.R. § 982.1(a)(1); *see also* 42 U.S.C. §1437, *et seq*. This program is known colloquially as "Section 8." *See Huff v. Marion Cty. Hous. Auth.*, No. 6:17-CV-00223-JR, 2018 WL 3763802, at *1 (D. Or. Aug. 8, 2018).

Plaintiffs nevertheless persist in arguing that 7 C.F.R. § 3560.662(f) could authorize Federal Defendants to terminate the 2019 Restrictive Use Covenants and allow prepayments on Bayview Plaza and Washington Plaza before 2032. (*See* Resp. at 8-9.) Specifically, in their response to Federal Defendants' motion, Plaintiffs extend the allegations in their complaint to argue that other forms of assistance received by Owner Defendants—and not the residents—could result in termination of the 2019 Restrictive Use Covenants. (*See, e.g.*, Resp. at 9 ("[T]he federal financial assistance received by owners participating in [Federal Defendants'] program has periodically ceased, creating ongoing risk that Plaintiffs may suffer harm from the disputed regulation and [Restrictive Use Covenant] provisions.").) The court disagrees for the reasons set forth below.

Federal Defendants use Restrictive Use Covenants to ensure that their Section 515 program regulations run with rental properties that enter the program and continue to apply to rental properties even after events such as a foreclosure, transfer of ownership, or mortgage loan prepayment. (Reply (Dkt. # 98) at 4.) The terms of Restrictive Use Covenants can vary but, as noted above, all must comply with the requirements set forth in 7 C.F.R. § 3560.662. *See id.* ("All restrictions require Agency approval and must be in accordance with the following restrictions . . . .").

Subsection 3560.62(f) prescribes a Restrictive Use Covenant term allowing the Covenant to terminate when Federal Defendants determine "that financial assistance provided the residents of the housing will no longer be provided due to no fault, action or lack of action on the part of the borrower." 7 C.F.R. § 3560.662(f). Federal Defendants implement this portion of Subsection 3560.662(f) by including language in its Restrictive

Use Covenants that permits an owner to terminate a Covenant if Federal Defendants "determine[] . . . that HUD Section 8 vouchers provided the residents of the housing will no longer be provided due to no fault, action or lack of action on the part of the Owner." This language appears in the Restrictive Use Covenants that Federal Defendants used for the properties at issue here in 2017 (when Owner Defendants prepaid) and in 2019 (when Owner Defendants settled with Plaintiffs, rescinded the prepayment, and re-entered the Section 515 program). (*See* Owen Decl. ¶¶ 5-6, Ex. 3 at 3, Ex. 4 at 3; Traxler Decl. ¶ 2, Ex. A at 2, Ex. B at 2-3.)

Plaintiffs' allegations in their fifth claim indicate correctly that the phrase—"financial assistance provided the residents of the housing" as used in 7 C.F.R. § 3560.662(f)—applies only to voucher payments to residents at the prepaid properties and not to other forms of subsidy that Federal Defendants pay directly to owners of properties that remain in the Section 515 program, such as Bayview Plaza and Washington Plaza. (*See, e.g.*, Compl. ¶ 98 (stating that federal "regulations contain a provision that authorizes the agency to lift use restrictions recorded against any property if *financial assistance provided the residents* is terminated for reasons outside the control of the owner") (italics added) (citing 7 C.F.R. § 3560.662(f)); *see also id.* ¶ 102 (referring to Plaintiffs as "voucher holders").)

Yet, despite these allegations, Plaintiffs argue in their response to Federal Defendants' motion that interruptions of "federal financial assistance received by owners" could trigger termination of the Restrictive Use Covenants. (*See* Resp. at 9.) Indeed, Plaintiffs ignore the distinction between assistance provided to residents and

assistance provided to owners by invoking both the Interest Credit and Rental Assistance as subsidies that "[P]laintiffs are currently receiving." (*See id.* at 9.)

Yet, federal regulations indicate that both Interest Credit, which reduces the interest rate on an owner/borrower's mortgage to one percent, and Rental Assistance, which provides owners rental interest rate income to supplement residents' limited income-based contributions, are paid to owners—not to residents. *See* 7 C.F.R. § 3560.67(b) ("The Agency will provide interest credit to subsidize the interest on the Agency loan to a payment rate of 1 percent for all of the Agency's initial and subsequent loans."); 7 C.F.R. § 3560.256(c) (stating "[p]rior to making [Rental Assistance] payments to a borrower . . ."). In contrast, Section 3560.662(f) applies only to "financial assistance provided the residents of housing"—not financial subsidies that Federal Defendants provide directly to owners. Moreover, Federal Defendants apply that regulatory language narrowly to only the loss of "HUD Section 8 vouchers provided the residents," which Plaintiffs undisputedly do not receive. (*See* Traxler Decl. ¶ 2, Ex. A at 2 ¶ 7, Ex. B at 2-3 ¶ 7.)

As a result, Plaintiffs fail to show that they have been injured by the application of Subsection 3560.662(f) to terminate the Restrictive Use Covenants, that they face the imminent threat of such injury, or that such injury is even possible given the current circumstances. Thus, the court concludes that the claim is moot. Further, the court concludes that Federal Defendants have met their burden on the inapplicability of voluntary cessation exception to mootness by "convincing the court that 'it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *See*

*Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 733 (9th Cir. 2007) (quoting *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 190 (2000) (citation omitted)).[6]

Further, even if Federal Defendants could terminate the Restrictive Use Covenants on Bayveiw Plaza and Washington Plaza, such termination would not lead to the injuries Plaintiffs allege, such as rent increases, dislocation, and loss of other regulatory protections of the Section 515 program. (*See* FAC ¶ 103.) This is so because unlike prepaid properties, which apart from Restrictive Use Covenants, are not subject to Section 515 program regulations, Bayview Plaza and Washington Plaza are not prepaid and so remain fully subject to Section 515 program rules and regulations as a result of Plaintiffs' settlement with Owner Defendants. As explained above, Federal Defendants cannot terminate the 2019 Restrictive Use Covenants based on a discontinuation of subsidies to Owner Defendants. But even if they did, Owner Defendants would remain subject to the Section 515 program regulations governing rent increases, tenant contributions to rent, and other lease terms and aspects of the landlord-tenant relationship. (*See* Stip. MTD Owner Defendants; Traxler Decl. ¶ 2, Exs. A, B.) Accordingly, the court concludes that Plaintiffs' fifth claim is moot and grants Federal Defendants' motion to dismiss it.

---

[6] Plaintiffs rely on *McFalls v. Purdue*, No. 3:16-cv-2116-SI, 2018 WL 785866 (D. Or. Feb. 8, 2018). (*See* Resp. at 6, 11.) Although the *McFalls* court held that a similar challenge to 7 C.F.R. § 3560.662(f) was not moot, the case is distinguishable. In *McFalls*, the owner still had a pending request to prepay a Section 515 program loan, and thus, prepayment and the plaintiffs' eligibility for vouchers remained possibilities. 2018 WL 785866, at *11 ("Defendants offer no evidence regarding the future applicability of the voucher program to [the plaintiffs], which is unknown until the 180-day waiting period expires . . . ."). Here, there is no pending prepayment request. The Defendant Owners rescinded their prepayments and have entered Restrictive Use Covenants prohibiting prepayment. (*See* Traxler Decl. ¶ 2, Ex. A at 2 ¶ 7, Ex. B at 2-3 ¶ 7.)

**C.      Claim 6**

In the sixth claim of their complaint, Plaintiffs allege a violation of their due process rights when Federal Defendants failed to advise Plaintiffs that they had a right to appeal Federal Defendants' decision to approve prepayment of the Section 515 loans for Bayview Plaza and Washington Plaza. (*See* FAC ¶¶ 104-09 (citing 42 U.S.C. § 1480(g)); 7 U.S.C. § 6991; 7 C.F.R. Part 11). Federal Defendants argue that because prepayments of the Section 515 loans at issue here no longer exist, Plaintiffs have no underlying substantive injury to which their procedural sixth claim relates. (*See* MTD at 15-16; Reply at 10-12.) Thus, they argue that the court must dismiss Plaintiffs' procedural claim as moot. (*Id.*) Indeed, the Supreme Court has instructed that the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Plaintiffs respond by asserting that their sixth claim is not moot because Federal Defendants might terminate the 2019 Restrictive Use Covenants and also might fail to notify them of their appeal rights "when and if" they do so. (Resp. at 13.)

As Federal Defendants point out, Plaintiffs argument contains not one, but two layers of speculation—that Federal Defendants might (1) terminate the 2019 Restrictive Use Covenants and (2) fail to notify Plaintiffs of their alleged appeal right following termination. The first layer of speculation fails for the reasons stated above. *See supra* § III.B. The second layer fails because it is founded on speculation about future events. "A mere speculative possibility of repetition is not sufficient." *Williams v. Alioto*, 549

F.2d 136, 143 (9th Cir. 1977). "[E]ven where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Smith v. United States Dep't of Agric.*, No. 15-CV-04497-TEH, 2016 WL 4179786, at *2 (N.D. Cal. Aug. 8, 2016) (internal quotation marks omitted) (quoting *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990)).

Further, because the court concludes above that the allegations contained in Plaintiffs' fifth claim "could not reasonably be expected to recur," *see supra* § III.B (quoting *Lozano*, 504 F.3d at 733), the court cannot conclude that the sixth claim falls within the exception to mootness for challenged conduct that is capable of repetition but evading review, *see S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515 (1911)). "Where, as here, the chance of repetition is remote and speculative," the court lacks jurisdiction and the matter should be dismissed as moot. *See Williams*, 549 F.2d at 142. Plaintiffs cannot salvage their procedural sixth claim by hitching it to their fifth claim because, as discussed above, that claim is also moot. Accordingly, the court concludes that Plaintiffs' sixth claim is moot and grants Federal Defendants' motion to dismiss it.

## IV. CONCLUSION

Based on the foregoing analysis, the court concludes that Plaintiffs' fifth and sixth claims are moot, GRANTS Federal Defendants' Rule 12(b)(1) motion (Dkt. # 93), and DISMISSES these claims with prejudice. In addition, because Plaintiffs do not oppose

the dismissal of their first through fourth and seventh through ninth claims, the court DISMISSES these claims with prejudice as well.

Dated this 23rd day of March, 2020.

JAMES L. ROBART
United States District Judge